LEXINGTON MILL & ELEVATOR COMPANY ET AL., APPELLANTS, V. THORNE A. BROWNE ET AL., APPELLEES.

FILED APRIL 10, 1928. No. 26073.

*Corcoran & Sprague,* for appellants.

*O. S. Spillman, Attorney General,* and *Hugh La Master,* contra.

*Peterson & DeVoe, amici curiæ.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and HOWELL, JJ.

EBERLY, J.

This is an action by plaintiffs to enjoin the enforcement by the Nebraska state railway commission of chapter 69, art. II, Comp. St. 1922 (sections 7224-7231), against them. From an adverse decision of the district court, appeal has been prosecuted to this tribunal by the plaintiffs herein.

The real controversy before us arises out of the business carried on by the Nebraska Wheat Growers' Association. This association functions as a cooperative marketing agency. Through and by it, grain, covered by contracts with its membership, is pooled and collectively sold in an orderly course of marketing within the pool year. As a "purchaser," using this term in the sense of one who acquires property for a consideration, it compensates for the grain received from its membership as follows: (1) A certain price in money paid as an "advance;" (2) by vesting in them an ascertainable undivided interest in the ultimate results of the business it carries on as an entirety.

As part of a transaction which results in the receipt of the membership grain, its induction into the channels of trade and final marketing thereof, and as a proper and reasonable incident thereto, the following contract was entered into by and between this association, the representative of certain of its local membership, and the plain-

tiffs in the present case, which, omitting formal parts and unessential particulars, is in the following terms:

"Witnessed: In consideration of the mutual obligation of the respective parties hereto, and as an aid in carrying out the undertaking on the part of the Nebraska Wheat Growers' Association to provide an efficient cooperate marketing system for wheat as set forth in existing contracts and agreements between the Nebraska Wheat Growers' Association and its individual members, and in consideration of the expense incurred and to be incurred by the company in providing local handling facilities for wheat and in pursuance of the provisions of the contract between the company and the Nebraska Wheat Growers' Association; it is agreed: 1. The local shall use the facilities of the company located at Oshkosh, Nebraska, in making the delivery of wheat of its members to the Nebraska Wheat Growers' Association, and deliveries of wheat which shall be made at Oshkosh, Nebraska, by the members of the local shall be made through the facilities of the company. 2. The charges for the receiving, handling, weighing, testing, grading, storing, loading and billing of the wheat to the Nebraska Wheat Growers' Association shall be as follows: Three and one-half cents per bushel (3½c per bushel) for all wheat delivered to elevator company. In consideration of this charge, the company agrees to deliver f.o.b. cars, the equivalent number of bushels of wheat as represented by scale tickets issued."

The above contract presents the difficulty in the case. A good faith performance by the parties thereto and with the evident purpose therein indicated, in fact, establishes the foundation on which this litigation proceeds. In substance, the state railway commission segregates the acts constituting a part of this incident from the general transaction in which they occur, and of which they form only a part. From this limited premise it draws the conclusion that, as on all of the grain received, only an "advance" was paid, and some of this grain remained in the elevators of

plaintiffs for more than ten days, this grain so possessed must be deemed "grain held in storage for a period longer than ten days," and in view of the fact that only an "advance" was paid thereon must also be considered as "grain which has been received ·at any grain elevator or grain warehouse for which payment has not been made within ten days after receipt of the same" (section 7224); that plaintiffs therefore must be deemed public warehousemen and, as such, are subject to the regulations and penalties provided by sections 7224-7231, Comp. St. 1922.

There is little or no conflict in the evidence. It fairly appears that, under the terms of this contract, as interpreted by all parties to it, members of this association hauled the grain produced by them to this contract elevator just the same as any other elevator, received a scale ticket issued by the elevator, and went to a bank and drew the advance on their wheat from the association. The elevator pays no part of the purchase price on the wheat, and enters into no obligation so to do.

The evidence also supports the conclusion that shipment by carload lots is contemplated by all parties to this contract, and that wheat delivered to contract elevators is held until carload lots have been accumulated; that ordinarily the "average bushel" did not remain in these elevators more than 3, 4, or 5 days, but in exceptional cases, due to delay in accumulating carload lots, or incidental to shipping and marketing, some of the wheat thus received from members of the association remained in these contract elevators in excess of 10 days.

It further appears that, while the owners of these contract elevators were employed in the business of buying and selling grain on their own account, they were not engaged in the public warehouse business in any way whatever save and except as the performance of the contract with the grain growers' association may have imposed or exacted such services from them. It fairly appears that all parties acted in good faith; that the purpose and intent of the contract and the result intended and accomplished

by it is fairly reflected by the terms employed which are hereinbefore quoted; that, as a matter of fact, the contract elevator in each case is and was the local representative of the association as contemplated by the contract before us as well as by the contracts between the members and the association; that the services under consideration, rendered as an entirety, were incidental to and essential and necessary in accomplishing the plan of cooperative marketing, adopted and carried out by the Nebraska Wheat Growers' Association.

The fundamental question therefore presented by the record before us is whether these acts and proceedings had by the plaintiffs, in view of all the circumstances of which they formed a part, bring the parties in interest within the provisions of sections 7224-7231, Comp. St. 1922, and subject them to the penalties therein provided.

"In order to determine the meaning of the language of an act of the legislature, it is proper to examine the course of legislation upon the same general subject." *State v. Cosgrave*, 85 Neb. 187.

The first legislation devoted to the subject before us was enacted in 1915 as chapter 243, Laws 1915, and is entitled, "An act to provide a public warehouse system for handling grain and to regulate the procedure thereunder." Section 1 of this act defines a public warehouse. Sections 2 to 7, inclusive, provide regulations of the government of that business. Section 8 is devoted to penalties for failure to conform to the provisions of the act.

The next, in order of time, was the enactment of chapter 155, Laws 1917, entitled, "An act to amend sections 1, 2, 4, and 8 of chapter 243, Session Laws of 1915, relating to public warehouses, and to repeal the original sections." This, with exception of one feature, is in force at the present time. Section 1 provides:

"Any grain dealer, person, firm, corporation, or association, in this state who receives grain for storage or shipment, or both, may avail himself of the provisions of this act by filing notice of his acceptance thereof with

the state railway commission and become thereby a public warehouseman. Any grain elevator or grain warehouse (other than at terminal points, which terminal points shall be designated by the state railway commission) in which grain is held in storage for a period longer than ten days is hereby declared a public warehouse within the meaning of this act, and any grain which has been received at any grain elevator or grain warehouse for which payment has not been made within ten days after the receipt of the same is hereby deemed to be held in storage."

In 1921 chapter 4, Laws 1921, was passed, which appears to be complete within itself and which is entitled, "An act to provide farm warehouses on the farm for storage of grains; to regulate the procedure thereof and to provide penalties for the violation of the same, and to declare an emergency." Section 1 of this act provided: "That any landowner, tenant, or manager of any lands in this state may store wheat or any other grain upon said land in a farm warehouse built and situated thereon and receive a warehouse receipt for same by complying with the provisions of this act." Sections 2 to 7, inclusive, provided regulations for the government of the business. Section 8 provided penalties for violation of the act. Section 9 related to the redemption of receipts issued by such warehouse. Section 10 provided that the provisions of chapter 76, Rev. St. 1913, "shall be applicable to this act whenever the same are not inconsistent herewith."

The last legislation relating to the matter under consideration appears to have been enacted in 1925 as chapter 80, Laws 1925, and is entitled, "An act to provide for the organization and incorporation of nonstock cooperative marketing companies and associations; and to define their powers."

For the purpose of this case we summarize the provisions of this last named act as follows: "Any number of persons, not less than five, engaged in the production of agricultural products of (or) two or more nonprofit cooperative associations of producers may form a nonprofit co-

operative association without capital stock for the purpose of producing, handling, processing, preparing for market, warehousing, preserving, * * * utilizing, and marketing * * * agricultural products of its members," and enable itself to engage in any activities for its membership of any of the things enumerated, including the purchasing or securing for its members of equipment, machinery, etc. Laws 1925, ch. 80, sec. 2.

The corporation thus authorized to be organized is expressly vested, by the terms of the act before us, with the following powers, in addition to others not herein enumerated: "(2) To buy, lease or hold any real or personal property necessary or convenient for the conduct and operation of the business or incidental thereto. (3) To buy and sell agricultural products including live stock for itself and its members and stockholders and others, and as agents on commission. (4) To enter into contracts with its members for periods not over five years requiring them to sell or market all or a specified part of their live stock or other products to or through the association. * * * (7) To act as agent or representative of any member or members or of nonmembers in carrying out the objects of the association. (8) To receive and employ warehouse receipts or other written instruments covering products of members stored on farms or elsewhere under suitable conditions issued or executed by any warehouseman, warehousing association, or other entity, which products may or may not have been inspected by inspectors licensed or authorized to inspect, sample, classify, grade, or weigh agricultural products under state or federal laws and which warehouse receipts or other written instruments may or may not be accompanied by the certificate or certificates issued by such inspectors on such products. * * * (10) To do each and everything necessary, suitable or proper for the accomplishment of any one or more of the purposes or the attainment of any one or more of the objects herein enumerated or the objects or purposes for which formed. * * * and to contract and act accordingly; and in addition to exercise and pos-

sess all powers, rights and privileges necessary or incidental to the objects or purposes for which formed or to the activities in which it is engaged or which further the accomplishment of such objects or purposes or the conduct of such activities; and in addition any other rights, powers and privileges granted by the laws of this state to ordinary corporations, except such as are inconsistent with the provisions of this act; and to do any such thing anywhere." Laws 1925, ch. 80, sec. 5.

We have thus before us three separate and distinct legislative acts, each evidently intended to be exclusive and complete within itself, so far as persons and transactions to which their terms apply. True, if any provisions appear in the earlier acts which are repugnant to the provisions incorporated in the last one in point of time, they are necessarily repealed by implication. But a careful examination of these enactments with reference to the transactions here involved, however, convinces us that as to it there is no necessary conflict between the provisions of any of them, and especially no conflict between the exercise of the "power of warehousing" conferred on the nonstock marketing association created by the act of 1925 and the restrictive and regulative provisions of the act of 1915, as amended in 1917, applicable solely to the business of public warehousing. Each act occupies and covers a definite sphere, and within that sphere is supreme and controlling. They do not overlap. A transaction properly within the purview of any one of them is not subject to the requirements of either of the remaining enactments.

If we are in error in arriving at this conclusion, so far as it applies to any of the legislation mentioned, there can be no question as to the correctness of the conclusion as applied to the act of 1925. Subparagraph (8) above set forth serves no purpose except to express the legislative intent to render the cooperative agency created by it wholly free from, and independent of, the restrictions and regulations therein referred to which were established by previous legislation. In addition to this, by section 14,

ch. 80, Laws 1925, it is further expressly provided that, "Any provision of law which is in conflict with this act shall not be construed as applying to any association herein provided for." So far as matters fairly within the scope of its powers are concerned, this act therefore must be deemed as exclusive and controlling.

The act of 1915, as amended, is occupied with a definition and regulation of an ultimate public business, public employment, a public vocation. Its purpose is the creation of a public warehouse system therein provided for. It has to do with the storage of property of others. Whatever may be said as to the option it, in terms, confers, as a mandatory enactment its sanctions are not concerned with the storage of the private property of the owner of the elevator or warehouse therein. In fact, public storage of grain is the sole, ultimate and controlling object of the public relation it assumes to define and regulate.

In view of the foregoing, the facts of the record sustain but one conclusion. All of the acts which the plaintiffs performed, as shown by the evidence, were within the terms of the contract under which they were employed; were acts authorized to be performed by the Nebraska Wheat Growers' Association by the terms of its constating act; were acts essential and necessary to be performed in order that the legislative intent disclosed by the terms of this legislation might be upheld, the business contemplated carried on, and the benefits intended for agriculture realized. Nothing was done by any person connected with the transaction as a colorable device to evade the penalties of the act of 1915, as amended.

Neither is this conclusion as to the relation of the parties modified because the terms of the contract involved the use of property belonging to the plaintiffs as such agents and employees of the corporation. This organization, it is to be remembered, is a cooperative corporation. It can act and perform only by agents and employees. Unless the state, by law, has established some distinctive police regulations applicable to agents and employees as distinguished from

the corporate employer, in the performance of an act authorized to the latter, such agents in that connection must be deemed authorized by the legislation of 1925. We find no such provision in the laws before us now under consideration.

By the terms of the law of 1925 the corporate entity it created was expressly empowered "to do each and everything necessary, suitable or proper for the accomplishment of any one or more of the purposes or the attainment of any one or more of the objects herein enumerated or objects or purposes for which formed, * * * and to contract and act accordingly; and in addition to exercise and possess all powers, rights and privileges necessary or incidental to the objects or purposes for which formed or to the activities in which it is engaged or which further the accomplishment of such objects or purposes or the conduct of such activities." Laws 1925, ch. 80, sec. 5, subd. (10). Indeed, this act, viewed as an entirety, must be deemed, not only as authorizing the formation of cooperative corporations, but also as declaratory of the public policy of this state on the subject of the cooperative marketing of grain (including all business and the details thereof related and forming a part thereof). As a remedial statute this court is warranted in giving it a liberal and effective construction.

There can be no question but what the terms of the contract quoted at the commencement of this opinion may be properly construed only in the light of the principles above set forth. When the rule is applied to this agreement, it is obvious that its provisions are in harmony with the controlling principles of public policy as thus established, and within the powers vested expressly, or by necessary implication, in the Nebraska Wheat Growers' Association. The effect of this contract was, therefore, to establish as binding upon the association and upon the state the fact that the acts of receiving, testing, grading, weighing, and the possession of wheat which ensued by

plaintiff is, under the facts of the record before us, the act of the association itself. On this basis this association is and was responsible to its membership for the contract grain delivered. It is, in fact, the relation which was contemplated by all parties and intended to be created by the contracts which they made. The conclusion is, (a) that this association, in the transactions before us, was if "warehousing," in legal effect, "warehousing" its own grain; (b) that the penalties of the act of 1915 apply only where the transaction questioned embodies "warehousing" the grain of others, as such "grain" is defined therein.

Neither does the fact that only an "advance" was made at the time of the receipt of the grain operate to change the rule. This is a cooperative transaction and the cooperators, by the terms of the contract, contribute grain to a going business in which they are not only parties in interest but actual proprietors. If the payment of "advance" be regarded as only a part payment, as contended for by the state, then, in the light of the entire transaction, the remainder of the compensation must be deemed to be the definite concrete contract right which, by the acceptance of the grain at delivery, became fully vested, contemporaneous with such delivery, in the member so delivering. Thereafter, such member was, in legal effect, neither the sole owner of the wheat he had delivered nor in strictness a creditor of the corporation. He was then in fact one of the proprietors of a going business, and, in event of successful termination thereof at end of pool year, would receive his *pro rata* share in the results of the pool. In the event of disaster, he might get nothing.

It follows, therefore, that, under the facts of this record, the wheat with which we are here concerned, after delivery, was the wheat of the association, in legal effect, in its continuous possession, and was not wheat "for which payment had not been made."

The facts of the present case thus fairly bring it within the reason and letter of the provisions of chapter 80, Laws 1925, and the public policy evidenced thereby.

The acts that the Nebraska Wheat Growers' Association are thereby lawfully authorized to perform, and the business it is lawfully empowered to carry on, may not be considered criminal as to its lawful agents by whose hands alone it may and does function, perform and transact.

Sections 7224-7231, Comp. St. 1922, therefore have no application whatever, and plaintiffs herein are not subject to penalties therein provided. The controlling element, under such circumstances as to be exempt from its terms, is "commerce," not "storage," as it is employed therein. *Kettenhofen v. Globe Transfer & Storage Co.,* 70 Wash. 645, 42 L. R. A. n. s. 902, and note. See, also, *Town of Arlington v. Central R. Co.,* 127 Ga. 721.

The act of 1915, as amended, having no application to the subject-matter before us, the question of the validity of the provisions thereof is not now for our consideration.

We may not wholly agree with the theories of the parties presenting this case; yet, under the evidence, plaintiffs are entitled to enjoin further action on part of the Nebraska state railway commission in reference to the transactions set forth in their petition.

The judgment of the district court dismissing the action is therefore reversed, and the cause is remanded, with directions to the district court to enter a decree in favor of plaintiffs in conformity with this opinion.

REVERSED.

Note—See Agriculture, 2 C. J. 998 n. 31 (New)—Warehousemen, 40 Cyc. 401 n. 6; 25 A. L. R. 1113; 33 A. L. R. 247; 47 A. L. R. 936.